**SEATTLE COMMUNITY COUNCIL FEDERATION, a Washington nonprofit corporation, Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRATION; Samuel Skinner, Respondents.**

No. 90–70253.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1991.

Decided April 9, 1992.

---

Peter J. Eglick and Henryk J. Hiller, Seattle, Washington, for petitioner.

Peter R. Steenland, Jr., and J. Carol Williams, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before: WRIGHT, BRUNETTI, and LEAVY, Circuit Judges.

BRUNETTI, Circuit Judge:

Petitioner Seattle Community Council Federation ("SCCF") challenges an order of the Federal Aviation Administration ("FAA") which changed the flight patterns of turbine-powered aircraft using the Seattle–Tacoma International Airport ("Sea-Tac"). The FAA issued a Finding of No Significant Impact ("FONSI") caused by the changes, thus relieving the FAA of preparing an Environmental Impact Statement ("EIS"). SCCF claims that the decision not to prepare an EIS was unreasonable and failed to consider the significant noise impacts of the changes. We have jurisdiction to review an order of the FAA pursuant to 49 U.S.C.App. § 1486(a) (1988). We affirm the FAA's order.

## I. Facts and Proceedings

Sea–Tac is publicly owned by the Port of Seattle and has been in operation since 1944. Aircraft approach procedures which routed planes landing to the south over Elliott Bay and Puget Sound had been in place for approximately twenty years. In order to increase airport efficiency and maintain safety, changes to existing procedures were considered starting in the mid–1980's.

In the latter part of 1989, the FAA issued an airspace study for Sea–Tac, analyzing thirteen different flight track patterns and recommending implementation of one pattern, known as the Four Post Plan (the "Plan"). On December 22, 1989, the FAA issued a Draft Environmental Assessment ("Draft EA") on the changes involved in the Plan, and solicited public comments until January 24, 1990. Also on January 24, the FAA held a public hearing.

SCCF submitted written comments to the FAA, criticizing the Draft EA and contending that more on-the-ground monitoring was necessary to assess noise problems.

On March 27, 1990, the FAA issued a Final Environmental Assessment ("EA"), retaining the Plan as the preferred alternative. The EA analyzed the possible changes in noise by employing data obtained in a 1988 aircraft noise study conducted by the Port of Seattle. This computer model established projected noise contours for the changed flight paths. The EA also used the 65 Ldn contour as the "threshold of significant noise impact."[1] No new physical studies were conducted.

Based on the EA, the FAA issued a FONSI on March 31, 1990, and issued a Record of Decision adopting the Plan on April 2.

On September 26, 1990, SCCF filed a motion to stay the implementation of the Plan pending review by this court. The motion was denied by another panel of this court on October 30.

## II. Statutory Framework

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347 (1988), mandates that for all "major Federal actions significantly affecting the quality of the human environment," a detailed statement must be prepared to analyze the environmental impact of the proposed action, adverse environmental effects which cannot be avoided, and alternatives to the proposed action. 42 U.S.C. § 4332(2)(c) (1988).

---

1. Ldn (or DNL) stands for Day–Night Sound Level, and is the standard federal noise measurement methodology. Ldn measures the cumulative noise exposure in decibels for a given area over a 24–hour period; noises occurring between 10:00 p.m. and 7:00 a.m. are weighted by an additional 10 decibels to reflect the increased sensitivity toward sound during nighttime hours.

An Ldn contour is developed by placing contour lines over a map of an airport and its surrounding areas to illustrate what the average noise level in a given area would be. Thus, the 65 Ldn contour is the area in which airport noise, on an average day, reaches at least the 65 decibel level.

The regulations promulgated by the Council on Environmental Quality ("CEQ"), *see* 40 C.F.R. §§ 1500–08 (1990), implement the directives and purpose of NEPA. 40 C.F.R. § 1500.1(a) (1990). "The provisions of [NEPA] and these regulations must be read together as a whole in order to comply with the spirit and letter of the law." 40 C.F.R. § 1500.3 (1990). The regulations have been enacted in such a way as to remove from the ambit of judicial review any agency decision which meets the requirements of the regulations.

The purpose of an EIS is to ensure that the agency is fully informed as to the environmental consequences of the proposed action and any measures that might be taken to mitigate those consequences. *LaFlamme v. FERC,* 852 F.2d 389, 398 (9th Cir.1988). An EIS *must* be prepared if the proposed agency action is one which "normally requires an environmental impact statement," 40 C.F.R. § 1501.4(a)(1) (1990), and may be prepared if the action is not categorically excluded from the requirement of an EIS. 40 C.F.R. § 1501.4(b) (1990). Based on the EA, the agency must determine whether to prepare an EIS. 40 C.F.R. § 1501.4(c) (1990). If the agency determines that an EIS is not required, it must prepare a FONSI. 40 C.F.R. § 1501.-4(e) (1990).

The FAA has also promulgated its own regulations which implement NEPA and set forth the policies and procedures for preparation of EAs, EISs, and FONSIs by the FAA. *See* Department of Transportation, Federal Aviation Administration Order 1050.1D, "Policies and Procedures for Considering Environmental Impacts," (12/21/83) ("FAA Order 1050.1D"). These regulations require that an EIS be prepared if the FAA action "has a significant impact on noise levels of noise sensitive areas." FAA Order 1050.1D § 37(a)(6). A noise sensitive area is one "in which aircraft noise may interfere with the normal activities associated with use of the land." FAA Order 1050.1D § 5(h).

An EIS is required when the FAA's action itself creates a significant impact, and when the cumulative impact of the action with other past, present and reasonably foreseeable future actions is significant. FAA Order 1050.1D § 37(b). A significant noise impact can be the result of either a change in the Ldn level in a noise sensitive area, or a relative change in the cumulative contour area. FAA Order 1050.1D, Attachment 2 § 1(b)(1).

## III. Standard of Review

■■■■ An agency's decision not to prepare an EIS will be overturned only if it was unreasonable. *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir.1988). An agency's decision not to prepare an EIS will be considered unreasonable if substantial questions are raised regarding whether the proposed action *may* have a significant impact upon the human environment, or if the agency fails to "supply a convincing statement of reasons why potential effects are insignificant." *Id.* (quoting *The Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir.1985)). This statement of reasons is crucial in determining whether the agency took the required "hard look" at the environmental impact of a project. *Id.* We will defer to an agency's decision only when it is "fully informed and well-considered." *Id.* (quoting *Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986)).

■■■■ As an appellate court, we may not make an independent determination as to whether the Plan will cause significant noise impacts; we may determine only whether the FAA's finding of no significant impact was reasonable. "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976)).

## IV. Analysis

 There is no statutory requirement that an EIS be prepared for an FAA decision to alter aircraft flight paths. The FAA was required to and did prepare an EA. In preparing the final EA, the FAA determined that an EIS was not required, as implementation of the action "will not significantly affect the quality of the human environment." Procedurally, the EA and FONSI prepared by the FAA meet NEPA's requirements.

The only issues which are relevant for our consideration on appeal are: (1) whether it was reasonable for the FAA to rely on the 65 Ldn contour as the threshold of significant noise impact; (2) whether it was reasonable for the FAA to rely on cumulative noise data; (3) whether it was reasonable for the FAA to conclude, without conducting further noise testing, that the Plan would not affect the existing 65 Ldn contour; and (4) whether the FAA properly considered the cumulative effects of the Plan.[2]

### Reliance on the 65 Ldn Contour

 The FAA carried out no new noise measurements because all changes in the flight paths under the Plan occur outside the preexisting 65 Ldn contour. SCCF argues that the use of the 65 Ldn contour as a "bright line" test for significant noise impacts is improper under NEPA.

It was within the FAA's discretion to establish 65 Ldn as the threshold of significance for noise impacts. NEPA authorizes federal agencies to develop their own methods and procedures in regard to environmental analysis. 42 U.S.C. § 4332(B) (1988). The FAA's decision to use 65 Ldn as its standard was neither arbitrary nor

capricious. *See Valley Citizens for a Safe Environment v. Aldridge*, 886 F.2d 458, 467–69 (1st Cir.1989) (reliance on National Academy of Science Guidelines which set 65 Ldn as the minimum of noise annoyance is an acceptable way to determine noise impacts; "the place to attack standard methodology ... is before the agency, not before a reviewing court"). Federal regulations establish 65 Ldn as the level below which aircraft noise is compatible with all land uses. 14 C.F.R. Part 150, App. A, Table 1 (1991). This table has been incorporated into FAA Order 1050.1D. "Table 1 provides examples of land uses which may be noise sensitive." FAA Order 1050.1D, Attachment 2 § 1(b)(1). We hold that the FAA's reliance on the 65 Ldn contour as the threshold of significant noise impact was not unreasonable.

### Reliance on Cumulative Noise Data

 SCCF also argues that the FAA erred in relying solely on cumulative noise data which was not enhanced by single-event noise measurements in determining that an EIS was not necessary.

Neither the CEQ regulations nor the FAA's own regulations require single-event testing in addition to or in lieu of cumulative testing. In fact, the FAA's regulations appear to require the use of cumulative data. "The exposure of individuals to noise resulting from the operation of an airport *must* be established in terms of yearly day-night average sound level...." 14 C.F.R. § 150.9(b) (1991) (emphasis added).

Further, other circuits have uniformly held that it is within an agency's discretion to determine which testing methods are

---

**2.** We need not consider SCCF's contention that the Plan is inconsistent with state and local laws regulating noise in residential neighborhoods, as those laws specifically exempt "sounds originating from aircraft in flight and sounds that originate at airports which are directly related to flight operations." Wash.Admin.Code § 173-60-050(4)(b); Seattle Muni.Code § 25.08.-530(A)(1).

We also do not need to consider at any length SCCF's contention that the EA did not contain a sufficient discussion of reasonable alternatives to the Plan. The EA considered and discussed

thirteen procedural and two non-procedural alternatives to the Plan. Although the analysis was not highly detailed, the FAA's rejection of the alternatives was reasonable, and we therefore defer to its judgment. *See City of Aurora v. Hunt*, 749 F.2d 1457, 1466–67 (10th Cir.1984) (FAA not required to analyze in detail alternatives it rejects in good faith as too remote, speculative, impractical, or ineffective); *Allison v. Department of Transp.*, 908 F.2d 1024, 1031 (D.C.Cir.1990) ("The FAA need not examine an infinite number of alternatives in infinite detail.").

most appropriate. *See, e.g., Valley Citizens,* 886 F.2d at 468–69; *C.A.R.E. Now, Inc. v. FAA,* 844 F.2d 1569, 1573 (11th Cir.1988); *Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 197 (7th Cir.), *cert. denied* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986); *Sierra Club v. Department of Transp.,* 753 F.2d 120, 128 (D.C.Cir.1985). Therefore, we hold that there was no error in the FAA's use of cumulative as opposed to single-event noise data.

*Impact On the 65 Ldn Contour*

■ A change in noise impact can occur if the contour area is enlarged to include areas that previously were within other contour areas. FAA Order 1050.1D, Attachment 2, § 1(b). Because the FAA did not measure or analyze noise in areas outside the preexisting 65 Ldn contour area, SCCF argues that the FAA ignored the possibility that the 65 Ldn might be enlarged, thus creating a significant noise impact requiring the preparation of an EIS. The FAA claims that its failure to generate new contours was reasonable because there was no change within the 65 Ldn contour based on the flight path changes in the Plan.[3]

The colloquial description of the changes in flight track patterns necessitated by the Plan [EA at 38–44] indicates that any changes under the majority of possible landing and arrival routes will occur at altitudes at or above 3000 feet. Those turns occurring below 3000 feet will occur over Elliott Bay, or other bodies of water, and thus cannot have an effect on noise sensitive areas.

Although the FAA's contention that "[C]hanges in flight patterns above 3000 feet, like these, are categorically excluded from environmental review, absent extraordinary circumstances," is an incorrect statement of the law, we do note that FAA Order 1050.1D requires that an EA and either a FONSI or an EIS be prepared for "New or revised air traffic control procedures which routinely route air traffic over noise sensitive areas *at less than 3000 feet* above ground level." FAA Order 1050.1D, App. 3 § 3(a) (emphasis added).

Changes in flight paths and changes in arrival and departure turns under the Plan would occur above the noise sensitivity threshold of 3000 feet, and the existing 65 Ldn contours therefore would not change. [EA at 50–51] In relevant part, the EA states as follows:

For the proposed changes in north or south flow patterns to affect the noise contours presented in Exhibit 18, the changes would have to take place within the DNL 65 and greater contours since it is aircraft flight in this area that produces the noise depicted by the noise contours....

*Proposed Action—North Flow*

In a northerly direction, the DNL contour ... ends approximately 6.25 miles north of the north end of the runways.... [O]ne can see that any change in the traffic pattern occurs north of the north end of the DNL 65 contours.

In a southerly direction, the DNL 65 contour ... ends approximately 6.82 miles south of the south end of the runways. Comparing the nearest turns from base leg to final leg of the approach from the south ..., we see that the turns occur, in both cases, south of Federal Way and south of the south end of the DNL 65 contour. Therefore, the proposed changes south of the airport will not change the DNL 65 or greater contours.

*Proposed Action—South Flow*

In a southerly direction, the DNL 65 contour ... ends approximately 6.82 miles south of the south end of the runways.... [W]e see that the point where departure turns are initiated is the same

3. In support of its opposition to SCCF's motion for stay, the FAA submitted the results of a new noise contour based on the actual operation of the Plan for the preceding six months.

We cannot consider this study in analyzing whether or not the FAA acted reasonably in failing to prepare an EIS with regard to the Plan. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

for either current or proposed south flow alternatives. Therefore, the proposed changes south of the airport will not change the DNL 65 or greater contours. In a northerly direction, the DNL 65 contour ... ends approximately 6.25 miles north of the north end of the runways.... [W]e see that the point where arrival turns on to the final approach are initiated is the same for either current or proposed south flow alternatives. Therefore the proposed changes north of the airport will not change the DNL 65 or greater contours.

*Conclusion*

Given that the DNL 65 and greater noise contours would not change as a result of the implementation of the proposed action, no significant noise impacts are expected to occur. Consequently, all locations outside of the DNL 65 contour would remain compatible with airport operations. [EA at 50–51]

Because the FAA has set 3000 feet above noise sensitive areas as the altitude below which routing changes will have a significant effect, and because all changes in routing under the Plan occur at or above 3000 feet *or* over areas that cannot be noise sensitive, we hold that the FAA's failure to prepare an EIS because the 65 Ldn contour would not change was not unreasonable.

*Cumulative and Indirect Effects*

Both NEPA and the FAA regulations require consideration of the cumulative effects of an agency action; cumulative effects are those impacts on the environment resulting "from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (1990). NEPA also requires consideration of indirect effects, which are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (1990).

The FAA acknowledges that air traffic into Sea–Tac is expected to increase after implementation of the Plan. The petitioner argues that the expected increase in volume is an indirect effect that the FAA has failed to consider. However, the avowed purpose behind implementation of the Plan is not to facilitate that expansion, but to ensure that safety and efficiency will be maintained.

The FAA does expect, given the operational trend of the past three years and the population increase in the metropolitan area, that the volume of traffic at Sea–Tac will continue to increase. Any increase in the number of operations experienced at Sea–Tac will be the result of demand of the flying public, which the FAA does not control. The foreseeable increase in demand, to the extent that it would exacerbate the existing delay problem at Sea–Tac, was in fact an impetus for proposing a change to the existing procedures. [EA Vol. I at 98 ("Response to Public Comments")]

Although the Plan is not intended to increase the volume of air traffic at Sea–Tac directly, the fact that it will increase the efficiency of the air traffic system and reduce delays will necessarily allow the volume to increase. However, the increase in volume is not a "growth inducing effect [or] other effect related to induced changes in the pattern of land use, population density or growth rate." 40 C.F.R. § 1508.8(b). Rather, the Plan deals with the *existing air traffic*. As explained in the "Final Environmental Assessment For Proposed Changes To Air Traffic Arrival and Departure Routes at Seattle–Tacoma International Airport" dated March 27, 1990:

[There is a] mistaken impression that the increase in capacity referred to in the Draft Environmental Impact Assessment means an increase in the number of aircraft operating to and from Sea–Tac. That is not the case. The proposed procedures are designed, among other things, to expand the FAA's use of existing airspace to more efficiently meet the *existing* air traffic demand at Sea–Tac. The effect of the proposed procedures would be to increase the arrival rate of aircraft that are currently utilizing Sea–Tac, but not reaching the Airport as quickly as they could given the restrictions on the FAA's use of airspace under

the current procedures. The proposed changes to arrival and departure procedures would simply accommodate the *existing* demand for landing and departing Sea–Tac more efficiently, thereby reducing delays. The proposed procedures do not enhance the ground capacity of Sea–Tac. There is no need to do so since there is existing ground capacity that is not fully used. This would be true even if the proposed procedures were put into effect.

Petitioner's Excerpt of Record at 153–54 (emphasis added). Thus, the Plan merely allows Sea–Tac to handle the *existing* traffic with greater efficiency. Its implementation is not designed to induce growth but rather to enhance the safety and efficiency of that traffic. Therefore it is not necessary to remand the matter to the FAA for further study of the effects of increased number of flights.[4]

The EA and FONSI conclude that the Four Post Plan would not have a perceptible effect on air quality, energy resources, or other categories identified in FAA Order 1050.1D. The Community Council does not challenge these findings on effects not related to noise; its argument here is limited to the FAA's handling of the cumulative and indirect noise effects. We conclude the FAA did not err in its evaluation of those effects.

AFFIRMED.

---

**4.** Even if the increased traffic were considered a cumulative and indirect effect of the plan, it still would not create significant new noise problems under the criteria we have accepted as appropriate. Any additional flight activity will still occur above 3000 feet, over areas not sensitive to noise, or in a manner that would not affect the 65 Ldn contour.