222 F.3d 677 (9th Cir. 2000)
 NATIONAL PARKS & CONSERVATION ASSOCIATION; MALAMA PONO, INC., Petitioners,
v.
U. S. DEPARTMENT OF TRANSPORTATION; RODNEY SLATER, Secretary, in his official capacity as Secretary of Transportation; FEDERAL AVIATION ADMINISTRATION, JANE in her official capacity as Administrator of the Federal Aviation Administration and WILLIAM WITHCOMBE, in his official capacity as Regional Administrator for the Western-Pacific Region of the Federal Aviation Administration, Respondents,
STATE OF HAWAII, Intervenor.
 No. 98-71268
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted November 3, 1999--Honolulu, Hawaii
Filed July 26, 2000
 Deborah A. Sivas, Earthlaw, Stanford, California, argued the cause for the petitioners.
 M. Alice Thurston, United States Department of Justice, Washington, D.C., argued the cause for the respondents. With her on the brief was Peter Coppelman, Acting Assistant Attorney General, Ellen Durkee, and Andrew Mergen, Department of Justice, and Daphne A. Fuller and Holly Woodruff-Lyons, Federal Aviation Administration, Washington, D.C.
 Thomas R. Keller, Acting Attorney General of Hawaii, Honolulu, Hawaii, filed a brief for Intervenor State of Hawaii. With him on the brief was Anne S. Faust, Lane T. Ishida and Bruce Y. Matsui, Deputy Attorneys General, Honolulu, Hawaii.
 On Petition for Review of a Decision of the Federal Aviation Administration
 Before: Dorothy W. Nelson, Alex Kozinski and William A. Fletcher, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 National Parks and Conservation Association and Malama Pono (collectively National Parks) are environmental organizations that petition for review of the Federal Aviation Administration's (FAA) approval of the expansion of Kahului Airport in Maui. National Parks contendthat the FAA violated the National Environmental Policy Act (NEPA), 42 U.S.C. S 4321 et seq., by failing to analyze the impact of the expansion on the introduction of alien, or non-indigenous, species into Maui. National Parks further contend that the FAA violated the Airport and Airway Improvement Act, 49 U.S.C. S 47106(c)(1)(C), and section 4(f) of the Transportation Act, 49 U.S.C. S 303(c), both of which govern the impact of transportation projects on the environment.
 
 
 2
 * Kahului is Hawaii's second largest airport after Honolulu International. In addition to inter-island traffic, Kahului serves flights from the mainland United States and, less frequently, Canada. Kahului's main runway can accommodate the arrival of any size airplane, but is too short for large carriers to take off with a full load of passengers, cargo and fuel. Such aircraft must either fly with a partial load or stop for refueling in Honolulu. To accommodate rising demand, the Hawaii Department of Transportation (HDOT) and the FAA plan to repave and strengthen the runway, extend it from 7,000 to 9,600 feet and make related infrastructure improvements. The centerpiece of the project is the runway extension, which would allow fully loaded large carriers to depart Kahului nonstop.[1]
 
 
 3
 National Parks contend that the runway extension will lead to more flights arriving at Kahului, thus introducing dangerous alien species into Maui. Alien species--a problem in Maui since the first Polynesian settlers arrived 1,500 years ago--are non-native animals, insects and plants introduced into the island by air or sea. Some of these new arrivals-primarily disease-carrying organisms and insects such as fruit flies--can become pests that damage crops, livestock and scenic areas. National Parks express special concern for nearby Haleakala National Park, the last intact habitat for a number of native species.
 
 
 4
 Because the project is a major federal action that affects the environment, see 42 U.S.C. S 4332, the FAA and HDOT drafted an Environmental Impact Statement (EIS), held hearings and solicited public and agency input. In response to widespread concern over alien species, the FAA convened a Biological Assessment Technical Panel consisting of experts from federal and state agencies, Maui County and private organizations. The resulting Biological Assessment reviewed the project, surveyed the alien species problem on Maui and proposed mitigation measures, though it acknowledged that "no one can predict which alien species might be introduced into Maui and/or Hawaii due to the Proposed Project. " Biological Assessment (BA) at 9-1. In addition, the Fish and Wildlife Service (FWS) prepared a Biological Opinion pursuant to the Endangered Species Act, 16 U.S.C. S 1536(a)(2), that found the project was "not likely to jeopardize the continued existence of any endangered, threatened, or proposed endangered species on Maui." Biological Opinion (BO) at 29. These documents were incorporated into the Final EIS, along with a report titled "The Threat of Alien Species to Natural Areas of Maui," an extensive bibliography, numerous independent studies of the project and responses to public comments.
 
 
 5
 Based on this documentation, the Final EIS concluded that "the impact of the Proposed Project on [the] alien species introduction rate is, in and by itself, insignificant. However, the introduction ofalien species is an existing statewide problem and therefore, the potential impact of the Proposed Project on the introduction rate of alien species, would be considered a significant cumulative impact. " FEIS S 3.11.3.3.
 
 II
 
 6
 Our review of an EIS under NEPA is extremely limited. We evaluate the EIS simply to determine whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a challenged action. Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987) (internal quotation marks omitted). We need not agree with the agency's conclusions; we must approve the EIS if we are satisfied that the EIS process fostered informed decision-making and public participation. See Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992). If we determine that the agency took a "hard look" at a project's environmental consequences, our review is at an end. Id.
 
 
 7
 Given the volume of information in the EIS that addresses alien species, National Parks can hardly claim the FAA ignored the problem. Instead, they argue that, had the FAA taken a harder look, it would have concluded that the project's alien species impact will be significant. Their claim hinges on two variables, the rise in international arrivals and the risk that such flights might carry dangerous alien species.
 
 
 8
 The EIS is replete with data regarding the project's impact on international arrivals. The very first table of the Biological Assessment estimates that 50 foreign flights will land at Kahului this year, all from Vancouver. See BA Table 1-1. With the runway extension, this figure is expected to grow to 1,200 yearly flights--1,100 from Japan and 100 from Vancouver--over the course of a decade.[2] But this increase-just three flights per day--pales in comparison to the total number of arrivals. Kahului currently serves 35,500 flights, a figure that is projected to rise to 40,350 in 2010 if the extension is built. International arrivals, then, will account for only 3% of the total air traffic at Kahului.
 
 
 9
 Even this modest increase, however, is not assured. As we have noted, airport demand projections are little more than guesses that depend on economic conditions, airline routing decisions and other variables. See City of Los Angeles v. Federal Aviation Admin., 138 F.3d 806, 807-08 & n.2 (9th Cir. 1998). The figures for Kahului are no exception. One independent study contained in the EIS found that tourism and airline executives expected "no or little lasting long-term growth-inducing impact" from the runway extension. EIS, app. E at 4-66. Another study noted that Hilo Airport on the Big Island has had a 9,800 foot runway for nearly 30 years, but lack of demand led to the phase out of all direct overseas flights. See id. at 4-5. Currently, demand from Asia is so low that three Asian carriers have ended service to Honolulu due to economic and strategic considerations. See EIS S 8.2.1 at 8-6. When it comes to airport runways, it is not necessarily true that " `if you build it, they will come.' " City of Los Angeles, 138 F.3d at 807.
 
 
 10
 Moreover, evidence in the EIS demonstrates that international arrivals could grow even if the runway is not extended. Kahului can already serve international flights, and cannot discriminate against a foreign carrier that wishes to establish a direct route. See EIS S 8.2.1 at 8-6. If service to Kahului becomes economically attractive, foreign flights could arrive in Maui regardless of the extension. See EISS 8.2.4 at 8-8. After all, planes don't need to stop in Honolulu to land at Kahului; if direct arrivals became profitable, a carrier could fly directly to Maui, but includea layover in Honolulu upon departure. Additionally, factors such as lighter aircraft or other technological advances could allow fully loaded planes to depart nonstop, even on the shorter runway.
 
 
 11
 The EIS also contains extensive discussion of the fact that the alien species impact of the project is highly uncertain. Foreign flights account for only 13% of the total number of animals, insects and plants introduced into Hawaii.[3] Of this relatively small influx, it is impossible to determine which species will be introduced at Kahului, or whether they will be dangerous. National Parks cannot identify a single species that will become established as a result of the project, nor can they pinpoint a particular resource that will be adversely impacted. Moreover, new alien species may not be harmful; since the 1970's, for example, 20 species of alien invertebrates per year have become established in Hawaii, only three of which have turned out to be economic pests. See BA at 1-1.
 
 
 12
 Though National Parks concede that there is "unquestionably some scientific uncertainty surrounding the potential alien species impact of the project," Opening Brief at 31, they nonetheless fault the EIS for failing to analyze the problem with adequate specificity. They rely heavily on Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437 (4th Cir. 1996), where the court rejected an agency's cursory discussion of the alien species impact of a dam construction project. But in Hughes River, the evidence showed that the proposed dam would cause the introduction of a specific species--the zebra mussel--that would lead to identifiable environmental harm. Under the circumstances, the court held that the agency must analyze the impact of the particular species. See id. at 445.
 
 
 13
 No such harmful species has been identified here, and possible environmental damage, if any, is purely speculative. It was therefore appropriate for the EIS to focus on broad mitigation measures to combat all types of alien species that might arrive at Kahului. The detailed mitigation plan outlined in the EIS includes traveler education videos, training of airport personnel and hiring of Arrival Inspectors. See BO at 2529. In addition, the project calls for a new air cargo building that would prevent escape of insects during inspection. After completion of the EIS, the FAA supplemented these measures with an Alien Species Action Plan that incorporates suggestions made by the National Parks Service and the public during the review process. For example, the Action Plan establishes an Alien Species Prevention Team to conduct risk management assessments and monitor data on inbound flights. See Record of Decision at 55-56. The FAA conditioned its approval of the project on the implementation of the mitigation measures in the Alien Species Action Plan. See id. at 31.
 
 
 14
 This analysis is nothing like the "perfunctory" two paragraph mitigation discussion we found inadequate in Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1380 (9th Cir. 1998). In Cuddy Mountain, the Forest Service's own experts found the mitigation plan so vague as to render it useless. See id. at 1381. By contrast, the FWS concluded that the "state of the art" measures at issue here "should make Kahului Airport a better barrier to invasion by alien species than any other airport in Hawaii. " BO at 2829. We have no difficulty concluding that the mitigation measures included in the EIS are sufficient to satisfy NEPA.[4]
 
 
 15
 In sum, National Parks seek too much from the EIS. While they may disagree with the FAA's substantive conclusions as to the alien species impact of the project, NEPA does not guarantee substantive results. See Northwest Envtl. Defense Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1536 (9th Cir. 1997). So long as the agency has made an informed decision, we cannot intervene. See Laguna Greenbelt, Inc. v. United States Dep't of Transp. , 42 F.3d 517, 526 (9th Cir. 1994). The discussion in the EIS is reasonably thorough, and we are satisfied that the FAA has made an informed decision. Because the EIS contains the requisite hard look at the alien species problem, it satisfies NEPA.
 
 
 16
 Our dissenting colleague goes astray by focusing solely on the flight projections contained in the Biological Assessment. See Dissenting Op. at 8887. This data may seem concrete, but in fact is highly speculative. As we explained above, airport demand projections are notoriously unreliable. See City of Los Angeles, 138 F.3d at 807-08 & n.2. Moreover, the dissent ignores entirely the analysis, contained elsewhere in the EIS, indicating that the project may not affect arrivals at all, or that flight increases may occur regardless of the runway extension. See page 685 supra. We review the EIS as a whole, see Northern Plains Resource Council v. Lujan , 874 F.2d 661, 666 (9th Cir. 1989), and where there is conflicting evidence in the record, the FAA's determination is due deference-especially in areas of agency expertise such as aviation forecasting. See City of Los Angeles, 138 F.3d at 808.[5] Judge Fletcher also disregards the fact that the mitigation measures will be implemented whether or not an increase in flights occurs. Kahului may in fact become a better barrier to alien species invasion than if the project were not completed. See BO at 28-29.
 
 III
 
 17
 For section 4(f) of the Transportation Act to apply, the project must "use" Haleakala National Park, a property protected by the Act. See 49 U.S.C. S 303(c). National Parks argue that the potential impact of alien species is a sufficient use of the Park to trigger section 4(f). But "use " turns on whether the action "substantially impair[s] the value of the site in terms of its prior significance and enjoyment." Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982). National Parks cannot demonstrate that the runway extension will so increase the rate of alien species introduction as to substantially impair Haleakala's economic or environmental value. The FAA's determination that the runway extension would not use the Park was not arbitrary or capricious. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416-17 (1971).
 
 
 18
 Nor does approval of the project violate the Airport and Airway ImprovementAct of 1982, 49 U.S.C. 47106(c)(1)(C), under which the FAA may not approve an airport development project that has "a significant adverse effect on natural resources" without first ensuring that "every reasonable step has been taken to minimize the adverse effect." AAIA S 509(b)(5). The only "reasonable step" National Parks identify as missing--funding for the mitigation measures--does not have to be finalized for the FAA to approve the project. See Citizens Against Burlington v. Busey, 938 F.2d 190, 206 (D.C. Cir. 1991) (section 509(b) requires only "a reasonably complete discussion of possible mitigation measures").
 
 
 19
 The Petition for Review is DENIED.
 
 
 
 Notes:
 
 
 [1]
 Since this petition for review was filed, the Governor of Hawaii has canceled plans for the runway extension. See, e.g., Claudine San Nicolas, Governor Halts Kahului Runway-Extension Plan, Ending 10-Year Controversy, Maui News, Feb. 9, 2000. The FAA's approval of the project, however, remains in effect. Because the extension could still go forward based on the Environmental Impact Statement at issue in this case, National Parks' challenge continues to present a live controversy. See County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979).
 
 
 [2]
 National Parks are primarily concerned with arrivals from Japan, as flights from a new port of origin carry a heightened risk of alien species introduction.
 
 
 [3]
 Domestic air traffic accounts for 27% of introduced species; first class mail, 23%; air and sea cargo, 18%; military vessels, 13%; and private boats and planes, 6%. See BA Table 1-5.
 
 
 [4]
 Contrary to National Parks' assertion, a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352-53 (1989) (requiring an EIS to include a complete mitigation plan would conflict with the principle that NEPA does not compel an agency to reach a particular substantive result); Laguna Greenbelt, Inc. v. United States Dep't of Transp., 42 F.3d 517, 528 (9th Cir. 1994) (NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency may act). In any event, National Parks fail to identify a single additional mitigation measure that they would have included had they been given the opportunity.
 
 
 [5]
 We are puzzled by the dissent's insistence that there is an inconsistency between our opinion and City of Los Angeles. See Dissenting Op. at 8890. In both cases we sustain the FAA's decision to approve an airport expansion based, in part, on the fact that predictions about the future are, of necessity, speculative. See City of Los Angeles, 138 F.3d at 807 n.2. In reaching this conclusion, we defer in both cases to the agency's own determination about the likely reliability of those prognostications. This is deference to agency expertise as we understand the concept. More difficult to understand is the dissent's notion of deference, which extends only far enough to undermine the agency's conclusions, but then fails to consider the EIS as a whole.
 
 
 W. FLETCHER, dissenting:
 
 20
 I respectfully dissent.
 
 
 21
 The Federal Aviation Administration (FAA) completed a Final Environmental Impact Statement (EIS) for the proposed runway extension at Maui's Kahului Airport on October 2, 1997. The FAA's Record of Decision (ROD), relying on the Final EIS in approving the runway extension, was signed on August 26, 1998. From the first serious consideration of this project in the 1980s until the preparation of the Final EIS, the FAA was aware that the introduction of alien species into the island ecosystem of Maui was a major concern. Considering the Final EIS as a whole, I reluctantly conclude that the FAA failed to take the requisite "hard look" at the likely impact of the extension on the introduction of alien species.
 
 
 22
 The Final EIS included a Biological Assessment prepared at the request of the FAA containing, among other things, projected increases in arriving flights due to the runway extension; a Biological Opinion prepared by the Fish and Wildlife Service in compliance with the Endangered Species Act; and numerous scholarly articles. The FAA thus possessed relevant information concerning the likely impact of the project on the introduction of alien species. But the FAA gave no indication, either in the Final EIS or in the ROD based on the Final EIS, that it evaluated or took critical aspects of this information into account. Indeed, far from taking a hard look, the FAA in the Final EIS and the ROD obscured the data and misstated its significance. In so doing, the FAA failed to comply with the National Environmental Policy Act.
 
 
 23
 * The National Environmental Policy Act (NEPA) is a procedural statute requiring government agencies to evaluate the environmental impacts of proposed projects before approval in order to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. S 4321. NEPA requires a detailed statement of the environmental impacts of the proposed project on the human and natural environment. See 42 U.S.C. S 4332(2)(c). The Supreme Court has interpreted this requirement to mean "that agencies [must] take a hard look at environmental consequences." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (internal quotation marks and citation omitted). NEPA is not, however, a substantive statute. As the Court wrote in Methow Valley, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Id.
 
 
 24
 The central flaw in the Final EIS is that the FAA failed to admit or analyze the likely environmental consequences of increased non-stop overseas arrivals resulting from the proposed runway extension. The FAA is free to conclude that the likely benefits of the extension outweigh the likely adverse environmental consequences, but it cannot arrive at that conclusion without first adequately admitting and analyzing those risks. Because of the demonstrableinsufficiency of the Final EIS, I find it impossible to agree with the majority's conclusion that the FAA took a "hard look" at the likely environmental consequences of its proposed action.
 
 II
 
 25
 The Final EIS concludes that the proposed project will have no impact on the introduction rate of alien species. It states its conclusion several times, with only slight variations: "The forecast increase of air passengers and air cargo to Maui . . . may result in an increase in the potential for the introduction or introduction rate, of alien flora or fauna species into Maui. This forecast increase of passenger and cargo will occur with or without the Proposed Project." FEIS S 3.11.3.2 (emphasis added). "A significant impact would occur if the proposed improvements would substantially increase the rate of introduction of alien pests. An insignificant impact would occur if the rate shows little or no increase. As the passenger levels and cargo/mail tonnage are similar in both the No-action and Proposed Project, the impact of the Proposed Project on alien species introduction rate is, in and by itself, insignificant." Id. S 3.11.3.3 (emphasis added). "[T]he introduction of alien species is an existing problem, and will continue to be a problem in the future with or without the Proposed Project." Id. S 5.1.6.1 (emphasis added). "The impact of alien species is a statewide problem and will not be fully resolved in this EIS. The issue will continue to be a significant problem with or without the Proposed Project, as alien species will continue to be introduced through other pathways, such as purposeful introductions, mail, and other ports-of-entry." Id. S 5.1.6.1 (emphasis added).
 
 
 26
 The ROD echoes the Final EIS: "[A]lien species introduction rate due to tourists currently traveling to Maui via airplane and ship, and cargo delivered to Maui by air and sea will continue to impact Maui's listed or candidate species, and other plant and animal species with or without the proposed project." ROD at 21-22 (emphasis added)."[T]he alien species introduction rate due to tourists currently traveling to Maui via airplane and ship and cargo delivered to Maui by air and sea will continue to impact Maui's listed or candidate species, and other plant and animal species with or without the proposed project." Id. at 22 (emphasis added). "By itself, the impact of the proposed project on the introduction rate of any alien species is insignificant . . . . " Id. at 28 (emphasis added).
 
 
 27
 These statements are based on a deception. The FAA proposes the runway extension at Kahului Airport because fullyloaded, fully-fueled non-stop overseas flights cannot take off from the present runway. As a physical matter, non-stop overseas arrivals can land on the present runway, but as an economic matter, many such arrivals -particularly those from Asia -are not profitable unless they are combined with nonstop overseas departures by those same airplanes. Thus, while the proposed runway extension will permit fully-loaded, fullyfueled aircraft to leave Maui on non-stop overseas flights, the practical and environmentally significant impact of the extension is that many non-stop overseas arrivals will become economically feasible for the first time.
 
 
 28
 Yet, according to the FAA, the significance of the runway extension is the departures it will permit, not the arrivals it will produce: "Although the existing 7,000-foot-long runway adequately serves domestic and international aircraft arriving at Maui, these arrivals do not and will not require the proposed extension to maintain service to Maui. Conversely, the existing runway is not long enough and does not have adequate pavement strength to accommodate departing , non-stop flights fully loaded[.]" Id. at 4 (emphasis in original). This statement accurately conveys the purpose of the extension, but that purpose cannot be the basis for ananalysis of its environmental consequences.
 
 
 29
 The FAA nevertheless conflates the purpose and its environmental consequences. It writes:
 
 
 30
 Flights arriving on Kahului Airport's existing run ways, in conjunction with oceanic vessels and other factors, provide pathways for alien species introduc tions to Maui. Alone the proposed project is not expected to significantly contribute to these intro ductions because it is designed to enable fully loaded aircraft departing Maui to fly non-stop to overseas destinations.
 
 
 31
 Id. at 22 (emphasis in original). Pause for a moment to consider the second sentence. According to the FAA, the alien species introduction rate will remain the same "with or without the project" because alien species do not arrive on departing aircraft. This is willful sleight-of-hand. The issue is not alien species that arrive on departing aircraft. Nothing arrives on departing aircraft. The issue, as the FAA well knows, is alien species introduced by arriving aircraft.
 
 III
 
 32
 The following data on arriving aircraft may be derived (with considerable effort) from Table 1-1 of the Biological Assessment. BA S 1.2. Without the proposed project, the FAA estimates that there will be 1,600 non-stop domestic overseas arrivals from the United States mainland in the year 2010. With the project, there will be an additional 1,460 such arrivals from the United States mainland. Without the proposed project, the FAA estimates that there will be 50 nonstop international overseas flights to Maui in the year 2010, all from Vancouver, Canada. With the project, there will be an additional 50 such arrivals from Vancouver.
 
 
 33
 The most critical issue, however, is the increased non-stop arrivals from Asia. There have been non-stop arrivals from North America to Maui for a number of years, but there have been virtually no non-stop arrivals from Asia. Because they are new, non-stop arrivals from Asia pose by far the greatest danger of introducing new alien species. According to Table 1-1, the proposed project will produce an increase in the yearly non-stop arrivals from Asia from 0 to 1,100.
 
 
 34
 In concluding that the introduction of alien species will be the same "with or without the proposed project, " the FAA emphasizes that the total number of people traveling to Maui will remain the same with or without the project. FEIS SS 3.11.3.2, 3.11.3.3. But the issue is not merely the number of people; it is also the number of increased non-stop arriving flights, particularly those from Asia. According to the FAA's own information, the airplanes themselves, not merely their passengers, are avenues for the introduction of alien species. As the Biological Opinion states, "The initiation of direct flights from Asia could increase the risk of Asian species being introduced that now have no direct route to Maui, particularly those organisms passively transported within the aircraft that would be released when the fuselage is opened." BO at 25 (emphasis added).
 
 
 35
 Even if one assumes that there will be no overall increase in non-stop overseas flights from Asia to the Hawaiian islands and that non-stop overseas flights originally bound for Oahu will instead land in Maui, the increased arrivals on Maui are significant. BA S 5.4. One might think that, if the only result of the extension is to shift non-stop Asian overseas arrivals from Oahu to Maui, the overall impact on the Hawaiian islands, considered as a whole, would remain the same. But this is not the case. The environment immediately around Kahului airport and on Maui generally is more hospitable to alien species than the environment immediately surrounding the Honolulu airport and on Oahu generally. The more hospitable, and therefore more vulnerable, environment on Maui results from several factors. First,the prevailing trade winds on Maui blow from the Kahului airport toward adjacent sugar cane fields and wetlands, whereas the prevailing winds on Oahu blow from the Honolulu airport toward the ocean. Second, the Kahului airport is immediately adjacent to hospitable environments for alien species, such as cane fields and wetlands, whereas the Honolulu airport is isolated from hospitable environments by expanses of concrete. Third, due to its greater elevations and greater geographical diversity, Maui has a much larger number of hospitable environmental niches than does Oahu. It is therefore possible that some alien species that could never establish themselves on Oahu could easily do so on Maui. Finally, even if we indulge the counterfactual assumption that the two islands are equal in their vulnerability to introduction of alien species, the Biological Assessment concluded that "opening Maui to more direct overseas flights [in addition to Oahu] doubles the potential area available for colonization." BA S 5.4.2.
 
 
 36
 The Biological Assessment states in its conclusion that "if the present aircraft flights are one of the pathways for alien species introduction into Hawaii, and if the Proposed Project results in more direct flights to Maui from the mainland U.S. and, in the future, from Asia, the Proposed Project could potentially increase the risk of alien species being introduced." BA S 9.1 (emphasis added). This conclusion fails to face up to the information the FAA has in its possession. The two clauses introduced by "if" purport to state hypothetical propositions. The first is not the least bit hypothetical. The FAA knows that aircraft flights are "one of the pathways for alien species introductions into Hawaii" and the FAA knows that this is particularly true for non-stop overseas flights. The second is hypothetical in the sense that it is a prediction rather than a fact, but the FAA itself has projected that the airport extension is likely to result in "more direct flights to Maui from the mainland U.S. and, in the future, from Asia," including 1,100 non-stop flights per year from Asia where none exist today.
 
 
 37
 A Memorandum of Understanding (MOU) and Alien Species Action Plan (ASAP) prepared after the issuance of the Final EIS and attached as part of the ROD promise a future assessment of the impact of the runway extension on alien species introductions. The FAA's proposed assessment will collect "extensive monitoring data to determine the relative risks associated with passengers, cargo, and the aircraft proper." ROD at 57. Because the assessment is proposed for the future, it cannot be considered as part of the EIS and therefore cannot be considered as part of the hard look the FAA and affiliated agencies were required to do prior to approving this project. We said in Seattle Audubon Society v. Espy, 998 F.2d 699, 704 (9th Cir. 1993), that an agency does not always need to "undertake further scientific study" before issuing an EIS, but that the agency must explain "why such an undertaking is not necessary or feasible." The FAA has not explained why the assessment it now proposes was "not necessary or feasible" prior to the adoption of the Final EIS. The information contained in the EIS and its incorporated documents show the necessity for the assessment, and the very fact that the FAA is now proposing the assessment shows its feasibility.
 
 IV
 
 38
 None of this matters to the majority. They conclude that the FAA's flight projections are unreliable. They write that "it is not necessarily true that `if you build it, they will come,' " supra at 680 (quoting City of Los Angeles v. FAA, 138 F.3d 806, 807 (9th Cir. 1998)), and that "airport demand projections are notoriously unreliable," id. at 8881 (citing City of Los Angeles, 138 F.3d at 807-08 & n.2). They conclude that plaintiffs "seek too much from the EIS." Id. And they conclude that "[t]he discussion in the EIS is reasonably thorough,and we are satisfied that the FAA has made an informed decision." Id.
 
 
 39
 The majority's skepticism about the FAA's projections is, I must say, convenient. Judge Kozinski quotes and cites his earlier opinion in City of Los Angeles to support his rejection of the FAA's projections. In that case, Judge Kozinski sustained an EIS for a proposed expansion of the Burbank Airport that would have doubled the number of gates, tripled the number of parking spaces, and quadrupled the size of the terminal. He relied on FAA "airport demand projections" in that case that had no more (perhaps less) claim to accuracy than the demand projections in this case. He wrote in City of Los Angeles, "The EIS estimates that the number of emplanements per year will grow from 1.7 million in 1990 to 5 million in 2010 whether or not the new terminal is built. Demand for an airport, says the FAA, depends much more on location than on how nifty the terminal is." 138 F.3d at 807-08. In that case, Judge Kozinski used the FAA projections (which he now calls "notoriously unreliable") to override what he described as the "common sense" of the opponents of the airport expansion. Id. at 808. As Judge Kozinski recognized in City of Los Angeles, airport demand projections are peculiarly within the expertise of the FAA. He should give as much deference to the FAA's projections in this case as he gave to such projections in City of Los Angeles. The FAA's projections of increased non-stop overseas arrivals may not be perfectly accurate, but they are entitled to more than an ad hoc rejection based on the "common sense" of the majority of this panel.
 
 
 40
 I do not agree with the majority that the plaintiffs in this case "seek too much." They ask only that the FAA honestly confront the knowledge they have in their possession. I also do not agree that the discussion in the EIS of the critical issue -the threat of introduction of alien species by non-stop overseas arrivals -is "reasonably thorough." It is virtually nonexistent, and what little discussion exists is dishonest.
 
 
 41
 Finally, while it is possible that the FAA has made an "informed decision," we cannot know that this is so. For all we can judge, the FAA may have analyzed alien species introductions resulting from arriving overseas flights as part of its internal decision-making process. But if such an analysis was made, the FAA should have put it in the EIS where it belongs.
 
 V
 
 42
 NEPA is a purely procedural statute. It does not require that an agency reach any particular decision in approving or disapproving a project. It does require, however, that the agency prepare a Final EIS that evaluates carefully and honestly the likely environmental consequences of a proposed action. The FAA has failed to perform its duty. Rather than taking a hard look at the possible environmental consequences, the FAA has deliberately averted its eyes from a well known environmental problem and from the potential consequences of its proposed action.
 
 
 43
 In failing to perform its duty under NEPA, the FAA has short-changed the political process Congress had in mind when it required the preparation of environmental impact statements. Because the FAA has failed in its duty, and because the majority of this panel has acquiesced in that failure, we will never know what decision a properly informed political process would have produced