IKUTA, Circuit Judge,
dissenting:
It is conventional wisdom among aviators that “when the weight of the paper equals the weight of the airplane, only then you can go flying.” The majority confirms the truth of this quotation: here a federal agency is trying to reduce airport delays and the concomitant negative environmental effects by commencing a project in anticipation of future growth, and the majority sides with delay and air pollution by imposing pointless paperwork on the agency before the necessary project can go forward. Because the majority’s approach is contrary to our case law and the facts, I dissent.
I
A new highway interchange, a new cargo port, and the expansion of the only bridge leading to an offshore island may all attract or facilitate development and thus 'have “growth inducing effects” under NEPA, 40 C.F.R. § 1508.8(b). See City of Davis v. Coleman, 521 F.2d 661, 674-76 (9th Cir.1975); Sierra Club v. Marsh, 769 F.2d 868, 878-79 (1st Cir.1985); Mullin v. Skinner, 756 F.Supp. 904, 917-21 (E.D.N.C.1990). Does expanding an existing airport have such an effect? Our case law, based on the informed input of the airport experts, says it does not. See Morongo Band of Mission Indians v. F.A.A., 161 F.3d 569, 580 (9th Cir.1998); Seattle Cmty. Council Fed’n v. F.A.A., 961 F.2d 829, 835-36 (9th Cir.1992); see also Nat’l Parks & Conservation Ass’n v. U.S. Dep’t of Transp., 222 F.3d 677, 680 (9th Cir.2000); City of Los Angeles v. F.A.A., 138 F.3d 806, 807-08 (9th Cir.1998).
We have reached this conclusion for several reasons. Most important, airports are expanded to avoid the negative effects that occur when the increasing demand for an airport based on existing conditions swamps that airport’s capacity, leading to increased delays and the environmental impacts such delays cause. See Morongo Band of Mission Indians, 161 F.3d at 572; Seattle Cmty. Council Fed’n, 961 F.2d at 835. In other words, before expanding an airport, the FAA engages in a complex process to project growth in demand, and plans the expansion to meet that growth. The goal is to prevent the airport from operating above its annual service volume (ASV), because when “demand reaches capacity, ■ delays increase exponentially.” More delays mean that airplanes will have to idle longer before taking off and circle longer before landing, which in turn leads to increased air emissions in the neighboring areas. It would be illogical to hold *1144 that after completing a study to determine future demand, and proposing a fix to avoid the negative impacts caused by the anticipated growth in demand, the FAA must then turn around and complete another study to determine whether the fix itself could possibly cause additional future demand. Where would this end? Thus, a leading NEPA treatise explains: “[A]n impact statement need not discuss growth-inducing impacts when a highway or other project is planned only to meet existing needs.” Daniel R. Mandelker, NEPA Law & Litigation, § 8.41 (2d ed.2010) (emphasis added).[1] Such a study would indeed serve little purpose, given that aviation demand is driven primarily by variables such as location, general aviation trends, the “demand of the flying public,” historical trends, and economic conditions, rather than the efficiency of the airport. See Seattle Cmty. Council Fed’n, 961 F.2d at 835; Natl Parks & Conservation Ass’n, 222 F.3d at 680. Thus we have said, “[wjhen it comes to airport runways, it is not necessarily true that ‘if you build it, they will come.’ ” Nat’l Parks & Conservation Ass’n, 222 F.3d at 680 (quoting City of Los Angeles, 138 F.3d at 807).
Applying this approach in Seattle Community Council Federation, we rejected the petitioner’s argument that the FAA should have considered the potential for increased air traffic due to the project’s improvements to the flight patterns of aircraft departing from and arriving at Seattle-Tacoma International Airport. 961 F.2d at 831. We explained that any material increase in air traffic would be due to existing trends, not due to the project itself. See id. at 835 (noting that “the volume of traffic at Sea-Tac will continue to increase” due to “the operational trend of the past three years and the population increase in the metropolitan area”). Indeed, these existing growth trends were the “impetus for proposing” the project in the first place. Id. Because the proposed changes “would simply accommodate the existing demand for landing and departing Sea-Tac more efficiently, thereby reducing delays,” we concluded that the environmental “effects of[the potential] increased number of flights” were not “growth inducing effects” that needed to be considered under 40 C.F.R. § 1508.8(b). Id. at 835-36.
We applied the rule again in Morongo Band of Mission Indians, where the petitioner claimed that the “FAA improperly failed to consider the ‘growth-inducing’ impact” of a project which, by virtue of making the airport run more efficiently, would also remove “a constraint to growth.” 161 F.3d at 580. Because “the project was implemented in order to deal with existing problems,” we held that “the fact that it might also facilitate further growth is insufficient to constitute a growth-inducing impact under 40 C.F.R. § 1508.8(b).” Id. Therefore, the FAA did not violate NEPA in failing to include in the EA an analysis of what additional demand (if any) might be induced by the project. See id.; cf. City of Carmel-by-the-Sea v. U.S. Dep’t of Transp., 123 F.3d 1142, 1162 (9th Cir.1997) (reasoning that any growth-inducing effect of the project would be “limited” because “Carmel is [already] a well developed area, and ... it is the existing development that necessitates the freeway” (emphasis added)).
The FAA and the Port followed exactly this approach here. In 2005, Hillsboro *1145 Airport (HIO) was already operating above its ASV. That year, the Port started the process of developing a Master Plan that “evaluates the airport’s capabilities and role, forecasts future aviation demand, and plans for the timely development of new or expanded facilities that may be required to meet that demand.” The Master Plan included a comprehensive forecast of aviation activity at HIO through 2025. Taking into account factors such as “national and regional aviation trends, historical and forecast socioeconomic and demographic information of the area, and historical trends” at HIO for different types of aircraft, the Master Plan projected that aviation demand would continue to grow such that, by 2025, HIO would be operating at 146% of its ASV, with an average delay of 6.0 minutes per aircraft operation. This additional congestion and delay would lead to further increases in the airport’s idle emissions. After examining a number of alternatives, the Master Plan concluded that the “best means available for reducing delays and the undesirable conditions that occur due to delay” over the next 20 years would be to add “a runway [at HIO] for use by small general aviation aircraft exclusively.”
The EA for the runway project relied on and adopted the Master Plan’s forecast of activity levels through 2025. As noted in the EA, the Port had conceived of and designed the runway project for the very purpose of meeting these forecasted needs, which were “expected to substantially exceed the ASV of the current airfield, with increasing levels of unnecessary congestion and delay corresponding to the increased demand.” Thus the record shows that the HIO project will lessen the environmental impacts of the demand pressure at the airport. Nothing in the record suggests the project will have any effect in increasing demand. Given this record, our case-law, and the FAA’s expertise, there is no basis for concluding that the EA was deficient in not addressing the question whether the HIO project would have growth-inducing effects above and beyond the existing demand curve.
II
But that is not even an issue raised by this case, because the petitioners waived it. No petitioner raised a “growth-inducing effects” issue in a way that “alert[ed] the agency to the [parties’] position and contentions,” Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 485 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)), such that the agency had an opportunity to “give the issue meaningful consideration,” id. To be clear, the issue here is not simply that use of the airport will continue to increase, creating more noise and traffic. The record establishes that this will happen in any event, and indeed, the pollution and environmental problems will be worse without the addition of a third runway. Rather, the “growth-inducing effects” issue is whether the addition of a third runway will increase the use of the airport beyond the anticipated increase based on existing conditions that was predicted by the Master Plan and was to be addressed by the project. Nothing in the record shows any of the petitioners raising that issue.
In claiming otherwise, the majority relies solely on a letter by petitioner Ackley during the public comment process. But the entire thrust of Ackley’s letter is to complain about the noise that is caused by air traffic.[2] He began with the complaint *1146 that “we live near the approach pattern to the present runway and the air traffic can be loud and distracting,” and then continued with a lengthy discussion of “[t]he adverse effect of air traffic noise on property values.” In the midst of this discussion, he wrote the one sentence on which the majority hangs its entire argument: “Increased air traffic will affect our quality of life and the value of our property should we wish to sell it.” In context, it is clear that Ackley is complaining about the noise caused by the ever increasing use of the airport, a topic the EA discusses at length. The letter’s inclusion of the three words “increased air traffic” cannot be deemed to have put the FAA on notice that Ackley was complaining about the growth-inducing effects of the third runway beyond the growth that would be caused by current conditions. Even the most enlightened bureaucrat reading Ackley’s letter could not possibly draw such an inference. Indeed, the majority’s argument that the FAA should have known that these three words were raising the “growth-inducing effect” claim blurs into the majority’s “so obvious” argument; in effect, the majority contends that in light of the “obvious” growth-inducing effect of a third runway, Ackley’s three words in a complaint about air traffic noise should have alerted the FAA that he was making such a claim.
But the majority’s “so obvious” argument likewise fails for a simple reason. It was not obvious that the HIO project would have growth-inducing effects, particularly since we have held exactly the opposite: when projects are designed to accommodate existing and projected demand, the FAA has no obligation to analyze the possibility that addressing these demands will also lead to a further increase in demand. See Seattle Cmty. Council Fed’n, 961 F.2d at 836. In fact, in the only case where we have addressed a runway project, we deferred to the FAA’s determination that the project would have “no or little lasting long-term growth-inducing impact,” despite the petitioners’ arguments that, had the FAA “taken a harder look, it would have concluded that the project’s alien species impact [would] be significant.” Nat’l Parks & Conservation Ass’n, 222 F.3d at 680.
Nor does the majority have any basis for countering our longstanding conclusion that airport projects do not have a growth-inducing effect. Indeed, nothing in the record suggests that the mere four- to five-minute time savings that will be occasioned by the addition of the third runway will cause a significant increase in demand. In fact, the only basis for the majority’s “so obvious” conclusion is its own conelusory statement that runways should be considered “unique” in their “potential to spur *1147 demand.” Maj. op. at 1138. Given our deference to agency expertise, we cannot rely on such unsupported conclusions.
The majority’s assertion that the FAA “had independent knowledge that the HIO expansion project would cause an increase in aircraft activity,” Maj. op. at 1133, is likewise contrary to the record. Although the majority combs through the record, it can point to only two comments (a question in an e-mail and a statement in a preliminary scope of work document) that even arguably relate to the issue of demand induced by the runway project itself. See Maj. op. at 1133-34. All this shows is that two employees at the FAA gave preliminary thought to the possibility of demand being induced by the runway project at the beginning of the administrative process, but the FAA (presumably informed by our case law and its own experts) determined that the issue did not need to be addressed in the EA. Such early considerations by an agency, which are resolved and never appear in the final, official document, cannot color our analysis of whether a particular impact is obvious. See Natl Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (“[TJhe fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.”); Butte Envtl. Council v. U.S. Army Corps ofEng’rs, 620 F.3d 936, 946 (9th Cir.2010) (stating that “[ajgencies are entitled to change their minds” and this means the review process is working “just as it should”). In other words, the fact that a couple of FAA employees made the same mistake as the majority does about the impact of an airport project (a mistake that was later corrected in the agency’s review process) is not evidence that the HIO project will cause an increase in demand, let alone that the FAA failed to address an “obvious” issue.
In sum, the FAA did not err in not addressing the question whether the third runway would have an additional growth-inducing effect. In holding otherwise, the majority ignores the deference we owe to agency decisionmaking and substitutes its own completely unsupported intuition about airports. I dissent.

. For the sake of its argument on appeal, the FAA entertained the counterfactual that a runway built for the very purpose of attracting new flights (or under other hypothetical circumstances not present in this case) "might require examining the impact of those new flights.” Such a rhetorical device is scarcely a "concession that a new runway may increase demand at certain airports.” Maj. op. at 1137 n. 10.

. In full, Ackley's letter said:
We are opposed to a third runway at Hillsboro because such a development would *1146 adversely affect our properly value and our quality of life. We live near the approach pattern to the present runway and the air traffic can be loud and distracting. Increased air traffic will affect our quality of life and the value of our property should we wish to sell it. This is not only our opinion but scientific studies document these affects as well.
The adverse effect of air traffic noise on property values has been well documented by over 20 different scientific studies. A meta-analysis of those studies found that, "Stated differently, under these same circumstances, a $200,000 house would sell for $20,000 to $24,000 less” (from A meta-analysis of airport noise and hedonic property values: Problems and prospects By Jon P. Nelson, Department of Economics, Pennsylvania State University). A conclusion like the above from a meta-analysis is a very powerful statement because the study considers other valid studies from metropolitan airports around our country. Therefore, in the face of valid scientific research and the in name of property owners near the Hillsboro airport, we urge you to discontinue study of the third runway option for the Hillsboro Airport.